**FILED**
**CLERK**

1/15/2016 9:05 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
EFRAIN DANILO MENDEZ a/k/a EFRAIN D.
MENDEZ-RIVERA, ALDRAILY ALBERTO
COISCOU, FERNANDO MOLINA a/k/a JORGE
LUIS FLORES LARIOS, SIRYI NAYROBIK
MELENDEZ, RENE ALEXANDER OLIVIA,
DANIEL SANTE, RAMIRO CORDOVA,
and JUAN FLORES-LARIOS, individually
and on behalf of all others similarly situated,

                Plaintiffs,

      v.

U.S. NONWOVENS CORP., SAMUEL MEHDIZADEH
a/k/a SOLOMON MEHDIZADEH, SHERVIN
MEHDIZADEH, and RODY MEHDIZADEH,

                Defendants.
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-5583 (ADS)(SIL)

<u>**APPEARANCES:**</u>

**Steven John Moser, Esq.**
*Attorney for the Plaintiffs*
3 School Street, Suite 207B
Glen Cove, NY 11542

**Cozen O'Connor**
*Attorneys for the Defendants*
277 Park Avenue
New York, NY 10172
   By: Michael Craig Schmidt, Esq., Of Counsel

**SPATT, District Judge.**

     This cases arises from allegations that the Defendants U.S. Nonwovens Corp.

("Nonwovens") Samuel Mehdizadeh a/k/a Solomon Mehdizadeh, Shervin Mehdizadeh

Mehdizadeh, and Rody Mehdizadeh (collectively, the "Defendants") failed to pay their

employees timely wages, overtime, and spread of hours wages in violation of the Fair

Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), and the New York Labor Law §§ 650, *et seq.* ("NYLL").

Presently before the Court is a motion by the Plaintiffs Efrain Danilo Mendez a/k/a Efrain D. Mendez-Rivera ("Mendez"), Aldraily Alberto Coiscou ("Coiscou"), Fernando Molina a/k/a Jorge Luis Flores-Larios ("Molina"), Siryi Nayrobik Melendez ("Melendez"), Rene Alexander Oliva ("Oliva"), Juan Flores-Larios ("Flores-Larios"), Ramiro Cordova ("Cardova"), and Daniel Sante ("Sante" and collectively, the "Plaintiffs") to certify a class action pursuant to Fed. R. Civ. P. 23 of "all non-exempt workers employed by U.S. Nonwovens in the State of New York from November 14, 2009 to the present."

For the reasons set forth below, the Court grants in part and denies in part the Plaintiffs' motion.

## I. BACKGROUND

### A. The Parties

#### 1. The Defendants

The Defendant Nonwovens is a New York corporation that "operates warehouse and factor[ies] in Brentwood, New York, and Hauppauge, New York." (Answer, Dkt. No. 71 ("Answer"), at ¶¶ 1–2, 11.) It "manufactures, markets and sells products that include household cleaning and nonwoven products." (Id. at ¶ 1.)

Presently, Nonwovens employs approximately 550 people, of which 280 to 330 earn hourly wages and are involved "in the production or handling of the products" that Nonwovens produces. (See Rody Mehdizadeh Dep., Moser Decl., Ex. 17 at Tr. 28:6–25.)

The Defendant Samuel Mehdizadeh is a shareholder of Nonwovens and has performed "various functions" for the company, though the record does not specify what those functions were. (See Answer at ¶ 24.) He is the father of the Defendants Shervin and Rody Mehdizadeh. (Id. at ¶ 8.)

The Defendant Shervin Mehdizadeh began his employment at Nonwovens in 1995 and at an unspecified date was promoted to the title of chief executive officer. (See Answer at ¶¶ 41, 44.)

The Defendant Rody Mehdizadeh began his employment at Nonwovens in 1997 and in 2011, was promoted to the title of chief operating officer. (See Rody Mehdizadeh Dep. at Tr. at 5:21–6:3; 8:14–14.)

**2. The Named Plaintiffs**

The named Plaintiff Mendez was employed by the Defendants as a "pallet loader" from May 2012 to November 2012. (Mendez Decl., Dkt. No. 172, Ex. 12, at ¶¶ 2, 4.) As a "pallet loader," Mendez would "move finished boxes ready for delivery to pallets, wrap the pallets, and then move them to a separate area of the warehouse." (Id. at ¶ 3.) The Defendants paid Mendez $7.25 per hour during h**is** employment. (Id. at ¶ 6.)

The named Plaintiff Coiscou was employed by the Defendants as a machine operator from August 2012 to September 2012 and was also paid $7.25 per hour. (See Coiscou Dep. Moser Decl., Ex. 21, at Tr. 44:3–25; First Amended Compl., Dkt. No. 70 ("FAC"), at ¶ 89.)

The named Plaintiff Molina was employed by the Defendants from August 2010 to October 14, 2012. (FAC at ¶ 97.) In August 2010, he was hired as a forklift operator and earned $7.25 per hour. (Id. at ¶ 98.) In January 2011, his wages were increased to $9

per hour.  (Id.)  In March 2011, he was promoted to the title of Production Supervisor and as a result, his wages increased to $12 per hour.  (Id.)  In September 2012, he became a Warehouse Manager but did not receive any increase in compensation.  (Id.)

The named Plaintiff Melendez was employed by the Defendants from September 4, 2012 to September 18, 2012 and was paid $7.25 per hour.  (FAC at ¶ 108.)  Her job entailed "pack[ing] containers of 'wipes' that were coming off production lines into boxes."  (Id.)

The named Plaintiff Oliva was employed by the Defendants from August 20, 2012 to November 2012 and earned $7.25 per hour.  (Id. at ¶ 108.)  His job duties are not specified in the record.

The named Plaintiff Sante was hired by the Defendants in August 2010 as a forklift operator and in that role, was paid $7.25 per hour.  (Sante Decl., Dkt. No. 172, Ex. 13 at ¶¶ 3, 5.)  In April 2011, he was promoted to assistant production manager, and his wages were increased to $14 per hour.  (Id. at ¶ 8.)  As an assistant production manager, his job was to "[make] sure that the production equipment was running properly, that employees were working their assigned tasks, and that orders were being fulfilled."  (Id.)  In January 2012, he was demoted to the position of "forklift operator" and his wages were reduced to $10 per hour.  (Id.)

The named Plaintiff Cardova was employed by the Defendants from May 23, 2001 to January 11, 2013.  (Cardova Decl., Dkt. No. 172, Ex. 11 at ¶ 5.)  He was initially hired as a machine operator and was paid $7.25 per hour.  (See id. at ¶ 5.)

The named Plaintiff Flores-Larios was employed by the Defendants from May 7, 2012 to September 2012 as a "fork lift operator and material handler" and was paid $7.25 per hour. (Flores-Larios Decl., Dkt. No. 172, Ex. 8 at ¶¶ 2–3.)

**B. The Defendants' Alleged Payroll Policies**

Each day, the plant managers at the Brentwood and Hauppauge factories would post a shift schedule, which contained a start time, a thirty minute break time, and an end time for each shift. (Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 92:13–23; Awan Dep., Moser Decl., Ex. 16, at Tr. 74:16–17.) When factory workers arrived to work, they were expected to use a "scanner" to punch into work, and when they left work, they were expected to use the scanner to punch out. (Muido Decl., Dkt. No. 172, Ex. 15, at ¶¶ 8-9.)

In addition, during each day shift and night shift, the Defendants required factory employees to take a one half hour break for meals. Shervin Mehdizadeh testified that during the meal break, "We shut down the machinery. We dim the lights. We turn off the electricity. The supervisors walk away. Power to the equipment goes down. The quality team is not there. They [the workers] go outside. They sit out. They go on the picnic table. They relax." (Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 134:12–17.) Malik Awan ("Awan"), the payroll administrator at Nonwovens since 2011, described the lunch break policy as follows:

Q. [D]id factory employees take a half an hour lunch when you started?

A. Yes. Mandatory for employees, because we have a line. The buzzer rings, there is a lunchtime. Everybody leaves the line and we also have some vendors and . . . the food truck outside. So they go and take lunch for half an hour at least. That is mandatory for each [employee], especially for factory employees to take half an hour lunch.

Q. How is that enforced?

A. Through the mangers.

(Awan Dep., Moser Decl., Ex. 16, at Tr. 82:15–22.)

As a result of the mandatory meal break period, the Defendants had a policy of automatically deducting half an hour from every factory worker's paycheck. (Id. at Tr. 78:6–20.)

Generally, employees were paid according to their shift hours, minus the mandatory thirty-minute lunch break. Rody Mehdizadeh, the Defendant's chief operating officer, explained the general practice as follows:

> If you are working during the shift, you get paid for it. If there is no shift and you are just hanging around because you're waiting for a ride and then you leave and then you punch out because your ride got there, you were there for an extra 15 minutes, then you don't get paid for that.

(Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 94:2–8.)

Malik Awan ("Awan"), the payroll administrator at Nonwovens since 2011, testified similarly:

> Q. Each shift of factory employees is paid for the shift hours. Is that right?
>
> A. Right . . . . [Y]ou have to realize these people come — they don't have cars. They take [a] ride or maybe come in one vehicle, like 10, 15 people, and they punch in the same time and sit[] in the lunchroom. However, the shift starts a certain time. That is why the schedule is put in there so they get paid by the time of shift instead of [when] they come in, five people, coming in one vehicle, punch in, sitting in the lunchroom enjoying themselves [sic] and then coming again, not punching in and going straight to the line. That is the whole purpose of the schedule.

(Awan Dep., Dkt. No. 174, Ex. J, at Tr. 174:21–175:9.)

Despite the fact that employees were generally paid according to their shift schedules, the Defendants testified that the firm's policy was to pay workers for overtime

if they worked multiple shifts, or performed work on the factory line outside of the

designated shift hours.  In that regard, Rody Mehdizadeh testified, "My belief system

always was you pay the hourly rate and whatever overtime is [] time and a half."  (Rody

Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 31:11–13.)  Similarly, Shervin

Mehdizadeh, Nonwovens' chief executive officer, testified:

> If the shift starts at 7 a.m. and they come a few minutes earlier, or an hour
> earlier because of dropoff and schedules, they will linger around the
> property.  And then the machines start and the factory doors open at 7 . . . .
> They start getting paid at 7.
>
> If they come in earlier because work is assigned to them, and that's far and
> few between — let's say their shift is at 7 and somebody else is assigned
> to come at 6:30 to turn on the boiler or something, that other person will
> get paid from 6:30 when he comes in, but the other person will get paid
> from 7.

(Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 131:22–132:12.)

It is also undisputed that payroll was processed on a weekly basis.  (Awan Dep.,

Moser Decl., Ex. 16, at Tr. 98:15–18; Muido Decl., Dkt. No. 172, Ex. 15, at ¶ 13.)

However, the process for issuing paychecks changed during the course of this lawsuit.

In a declaration filed by Oona B. Muido ("Muido"), a payroll clerk from February

2011 to August 2011, Muido described the process prior to 2012, as follows:

> Each week, before the payroll was processed, I retrieved all electronically
> stored attendance records from the scanners.  I then printed the records out
> and reviewed them to see if any employee was missing records for that
> week.  I would then forward the time records with punch clock
> information to the appropriate supervisors so that they could review and
> manually fill in the missing information . . . . After manually filling in the
> missing attendance information, the supervisors would then return the
> printouts to me so that I could input the information into the computer
> system.  I would then print out the updated records and return the reports
> to the supervisors so that they could review the total hours worked for the
> week.  If the supervisors did not agree with the total hours, they would
> explain the difference in hours and have the time records changed to
> reflect the amount of hours they believe[d] the employees worked.  This

could mean a reduction or an increase . . . . Once the time records were
finalized, the records were then forwarded to Shervin Mehdizadeh to
review . . . . Once approved by Shervin, the time records were sent to ADP
to generate employee paychecks.

(Muido Decl., Dkt. No. 172, Ex. 15, at ¶¶ 14–23.)

Under this process, if after receiving a paycheck, an employee believed that his or
her paycheck did not account for certain hours worked, then the employee would raise a
concern with a manager.  (Id. at Tr. 67:2–8; Shervin Mehdizadeh Dep., Moser Decl., Ex.
18, at Tr. 83:9–17.)  The manager would then bring the paycheck to Rody, Samuel, or
Shervin Mehdizadeh, who would initial a change to the paycheck to compensate the
employee for the missed hours.  (See Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at
Tr. 85:7–86:22; Muido Decl., Dkt. No. 172, Ex. 15, at ¶¶ 27–28.).

Also prior to 2012, the Individual Defendants Rody and Shervin Mehdizadeh
testified that they did not compensate employees for spread of hours wages because they
were not aware of the New York spread of hours provision.  (See Rody Mehdizadeh
Dep., Moser Decl., Ex. 17, at Tr. 30:3–19; Shervin Mehdizadeh Dep., Moser Decl., Ex.
18, at Tr. 48:3–15.)

By way of background, New York regulation requires that "[a]n employee . . .
receive one hour's pay at the basic minimum hourly wage rate, in addition to the
minimum wage required in this Part for any day in which . . . the spread of hours exceeds
10 hours." 12 NYCRR § 142-2.4.  "Spread of hours" is, in turn, defined as "the interval
between the beginning and end of an employee's workday" and "includes working time
plus time off for meals plus intervals off duty."  Id. at § 142-3.16.  In other words, "an
employer must pay an employee who works more than ten hours in one day an additional
hour at the minimum wage."  (See Mar. 5, 2014 Order, Dkt. No. 67, at 16–17) (quoting

parenthetically <u>Palacios v. Z & G Distributors, Inc.</u>, No. 11 CIV. 2538 AT FM, 2013 WL

4007590, at *3 (S.D.N.Y. Aug. 6, 2013)); <u>see also</u> <u>Shahriar v. Smith & Wollensky Rest.</u>

<u>Grp., Inc.</u>, 659 F.3d 234, 242 (2d Cir. 2011) (noting that the spread of hours provision

requires "employers to pay servers an extra hour's pay at the regular minimum wage for

each day they work more than ten hours.") (citing N.Y. Comp.Codes R. & Regs. tit. 12, §

137–1.7 (2010)).

After November 13, 2012, when the Plaintiffs commenced this lawsuit, the

Defendants made two changes to their payroll policy.

First, the Defendants instituted a policy whereby employees would review their

hourly reports before a paycheck was issued, and not after a paycheck was issued, as was

the custom prior to 2012. Awan, Nonwovens' payroll administrator since 2011,

described the new process as follows:

> So we have improved our process. What we do is we process the pay
> proactively, so our weeks from Monday to Sunday and payday is
> Thursday. So, for example, for the last week, every Monday I send out
> reports to managers and employees, which is missed punch reports. It has
> [the] manager [sic] name, to validate and sign, employee's name on the
> bottom to acknowledge that it's been corrected, he is getting paid correct
> [sic]. I send out these reports every Monday so that if anybody has any
> issues they speak to their manager, sign, acknowledge it's been corrected.
> And all these time sheet adjustments come to me and I process [them] in
> the payroll.

(Awan Dep., Moser Decl., Ex. 16, at Tr. 59:20–60:17.)

Shervin Mehdizadeh described the changes to the approval process using similar

terms:

> So Malik basically went to the different supervisors . . . and make [sic]
> himself more available and ask people if you forgot to punch in, tell us;
> don't be ashamed or don't be embarrassed and don't wait. Tell us before
> we officiate it in the ADP software so that we can proactively . . . fix it
> before you get paid so you don't have to wait until the next pay cycle.

(Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 90:16–91:2.)

Second, the Defendants changed the payroll system so that employees could be paid for spread of hours wages.  (See Awan Dep., Moser Decl., Ex. 16, at Tr. 62:8–14; Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 48:4–25; Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 50:8–10.)

However, Awan, Shervin Mehdizadeh, and Rody Mehdizadeh were not able to give a precise date as to when the Defendants began to pay employees for spread of hours wages.  (See Awan Dep., Moser Decl., Ex. 16, at Tr. 62:15–21; Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 48:16–25; Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 50:25–51:5.)

## C. The Procedural Background

On November 13, 2012, the Plaintiffs Mendez, Coiscou, Molina, Melendez, and Oliva commenced this action against the Defendants, asserting five causes of action: (i) the Defendants failed to pay their employees overtime pursuant to FLSA § 207(a)(1); (ii) the Defendants failed to pay their employees overtime pursuant to Section 142-2.2 of Title 12 of the New York Compilation of Codes, Rules, and Regulations ("NYCRR"); (iii) the Defendants failed to pay their employees timely wages pursuant to NYLL § 191(1)(a); (iv) the Defendants failed to pay their employees spread of hours pay pursuant to Section 142-2.4 of Title 12 of the NYCRR; and (v) the Defendants failed to comply with the notice provisions set forth in NYLL § 195.

On January 14, 2013, the Defendants filed an answer denying the principal allegations contained in the complaint.

On August 28, 2013, the Plaintiffs filed a motion pursuant to Fed. R. Civ. P. 15 for leave to amend their complaint by (i) adding Flores-Larios, Cardova, and Sante as named Plaintiffs; (ii) adding a cause of action alleging that the Defendants failed to pay their employees overtime compensation in a timely manner pursuant to Section 778.106 of Title 29 of the Code of Federal Regulations ("CFR"); and (iii) adding a cause of action for breach of contract.

On September 16, 2013, the Plaintiffs filed a motion to conditionally certify a collective action pursuant to FLSA § 216(b) of "all non-exempt workers employed by U.S. Nonwovens in the State of New York from November 14, 2009 to the present" who were allegedly not paid overtime pursuant to FLSA § 207(a)(1).

On November 15, 2013, United States Magistrate Judge William D. Wall rendered a decision granting the Plaintiffs' motion for conditional certification of a collective action but directed the parties to submit an amended notice form. (See Nov. 15, 2013 Order, Dkt. No. 38.)

On March 5, 2014, this Court granted the Plaintiffs' motion to file an amended complaint. (See Mar. 5, 2014 Order, Dkt. No. 67, at 31.)

On March 12, 2014, the Plaintiffs filed an amended complaint alleging the following seven causes of action: (i) the Defendant failed to timely pay their employees overtime pursuant to 29 CFR. § 778.106; (ii) the Defendants failed to pay their employees overtime pursuant to FLSA § 207(a)(1); (iii) the Defendants failed to pay their employees overtime pursuant to 12 NYCRR § Section 142-2.2; (iv) the Defendants failed to pay their employees timely wages pursuant to NYLL § 191(1)(a); (v) the Defendants failed to pay their employees spread of hours pay pursuant to 12 NYCRR § 142-2.4; (vi)

the Defendants failed to comply with the notice provisions set forth in NYLL § 195; and (vii) the Defendants breached an oral agreement to pay the Plaintiffs "the first 40 hours worked at the regular rate of pay, and all hours worked in excess of 40 hours per week at the overtime rate."

On April 24, 2014, Judge Wall approved of the notice form to be mailed to the potential collective action members. (See Apr. 24, 2014 Order, Dkt. No. 76, at 6–7.)

On May 15, 2014, the notice was timely mailed to 1,238 potential collective action members. By July 8, 2014, the end of the opt-in period, seventy-eight current and former employees opted into the collective action in addition to the eight named Plaintiffs. (See Consent Forms, Dkt. Nos. 72-74, 79-97, 101-113, 115-153, and 155-159.)

On May 29, 2015, the parties completed discovery in advance of the Plaintiffs' proposed motion to certify a Rule 23 class action.

On August 31, 2015, the Defendants filed a motion to decertify the collective action. On September 19, 2015, the Court referred the Defendants' motion to United States Magistrate Judge Steven I. Locke for a decision. The Defendants' motion is currently pending before Judge Locke.

**D. The Plaintiffs' Rule 23 Motion**

As noted, presently before the Court is a motion by the Plaintiffs to certify a class action pursuant to Fed. R. Civ. P. 23. They seek to certify a class of "all non-exempt workers employed by U.S. Nonwovens in the State of New York from November 14, 2006 until the present" on the basis of four of the seven causes of actions asserted in the amended complaint: specifically, (i) the third cause of action alleging that the

Defendants failed to pay their employees overtime pursuant to 12 NYCRR § 142-2.2; (ii) the fourth cause of action alleging that the Defendants failed to pay their employees timely wages pursuant to NYLL § 191(1)(a); (iii) the fifth cause of action alleging that the Defendants failed to pay their employees spread of hours pay pursuant to 12 NYCRR § 142-2.4; and (iv) the seventh cause of action alleging that the Defendants breached an oral agreement with its employees by failing to pay their employees "straight wages." (See the Pls.' Mem. of Law, Dkt. No. 171, at 1–2.)

In support of their motion, the Plaintiffs rely on (i) the declarations of the eight named Plaintiffs and twenty-five current and former employees who opted into the collective action; (ii) the declaration of Mayela Montanez ("Montanez"), a former human resources director for Nonwovens; (iii) the declaration of Muido, a former payroll clerk for Nonwovens; (iv) the deposition testimony of Awan, the payroll administrator at Nonwovens since 2011; (v) the deposition testimony of the individual Defendants Samuel, Shervin, and Rody Mehdizadeh (collectively, the "Individual Defendants"); (vi) the deposition testimony of the named Plaintiffs Mendez, Coiscou, and Sante; (vi) the Defendant's supplementary responses to the Plaintiffs' interrogatories; and (vii) the payroll records of Junior Euceda ("Euceda"), Walter E. Yanez ("Yanez"), and Carlos Velazquez ("Velazquez"). (See Moser Decl., Exs. 7–50.)

The Defendants oppose the Plaintiffs' motion, asserting that the Plaintiffs have failed to establish the requirements set forth in Fed. R. Civ. P. 23(a) and (b), and that the class definition offered by the Plaintiffs is too broad. (See the Defs.' Opp'n Mem. of Law, Dkt. No. 174.) In support, they rely on (i) different portions of the deposition testimony offered by the Plaintiffs; (ii) payroll records for many of the named Plaintiffs

and opt-in Plaintiffs; and (iii) the Plaintiff Sante's responses to the Defendants' first set of interrogatories.  (See id., Exs. A–K.)

The Court will assess the parties' positions in light of the evidence described above.

## II. DISCUSSION

### A. The Legal Standards

#### 1. Fed. R. Civ. P. 23

A class action may only be certified if it meets the following requirements set forth in Fed. R. Civ. P. 23(a):  (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation").

In addition to these four requirements, a class must meet one of the three standards set forth in Fed. R. Civ. P. 23(b).  Here, the Plaintiffs seek to certify a class under Rule 23(b)(3), which requires that:  (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members," also referred to as the "predominance" requirement; (ii) and "the class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy," also known as the "superiority" requirement.

"The party seeking class certification bears the burden of proving compliance with each of Rule 23's requirements by a preponderance of the evidence." Callari v. Blackman Plumbing Supply, Inc., 307 F.R.D. 67, 74 (E.D.N.Y. 2015) (Spatt, J) (citing

Perez v. Allstate Ins. Co., No. 11–CV–1812 (JFB) (AKT), 2014 WL 4635745, at *12 (E.D.N.Y. Sept. 16, 2014); see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008) ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements.").

In that regard, a district court may only certify a class action if it concludes after a "rigorous analysis" that the proposed class meets the requirements of Rule 23(a) and (b). See Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) ("A class may be certified only if, 'after a rigorous analysis,' the district court is satisfied that the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met.") (quoting Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432, 185 L. Ed. 2d 515 (2013)).  Such an analysis will often "entail some overlap with the merits of the plaintiff's underlying claim."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011); accord Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008) ("'[T]he obligation to make such [factual] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.'") (In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006)).

### 2. Commonality and Typicality After *Dukes*

In Wal-Mart Stores, Inc. v. Dukes, *supra*, the United States Supreme Court clarified the commonality requirement under Rule 23(a).  131 S. Ct. 2541.  There, three female former employees of Wal-Mart sought to certify a class pursuant to Fed. R. Civ. P. 23(b)(2) of 1.5 million current and former Wal-Mart employees who alleged that the

company discriminated against them on the basis of their gender in violation of Title VII

of the Civil Right Act of 1964, 42 U.S.C. § 2000e-1, *et seq.* ("Title VII"), by denying

them equal pay and promotions.  Id. at 2547–48.

On appeal in Dukes, the Supreme Court found that the Ninth Circuit erred in

finding that the class satisfied the commonality and typicality requirements of Rule 23(a).

Id. at 2553–57.  In defining the commonality requirement, the Court noted:

> 'What matters to class certification . . . is not the raising of common
> 'questions' — even in droves — but, rather the capacity of a classwide
> proceeding to generate common answers apt to drive the resolution of the
> litigation. Dissimilarities within the proposed class are what have the
> potential to impede the generation of common answers.'

Id. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.

Rev. 97, 131–132 (2009)).

In addition, the Court read its prior decision in General Telephone Co. of

Southwest v. Falcon, 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982) to

suggest the proper "framework" to approach the commonality issue in a discrimination

class action — namely, the movant must show either that (i) the employer used a "biased

testing procedure to evaluate both applicants for employment and incumbent employees";

or (ii) they could offer "[s]ignificant proof that an employer operated under a general

policy of discrimination." Dukes, 131 S. Ct. at 2553.

The named plaintiffs in Dukes did not offer proof of "biased testing procedures,"

and instead sought to establish that Wal-Mart operated a general policy of discrimination

by offering (i) expert testimony from a sociologist that Wal-Mart had a "strong corporate

culture" that made it vulnerable to gender bias; (ii) expert testimony from a statistician

that there were statistically significant disparities between men and women at Wal-Mart;

and (iii) anecdotal evidence from current and former employees who allegedly experienced discrimination on the part of their supervisors.  See id. at 2553–2555.

The Supreme Court in Dukes found the proof offered by the named plaintiffs to be inadequate to establish a general policy of discrimination.  Id. at 2554.  First, it concluded that on its face, Wal-Mart's policy allowed discretion to supervisors over employment matters, which the court noted was the "opposite of a uniform employment practice that would provide the commonality needed for a class action."  Id.  Second, it found that the expert testimony of the sociologist did not establish a general policy of discrimination because it did not show with any "specificity" that Wal-Mart's culture "play[ed] a meaningful role in employment decisions at Wal-Mart."  Id. at 2553–54.  It also found the expert testimony of the statistician to be unpersuasive because merely proving the existence of a gender disparity is not sufficient to under Title VII to establish a general policy of discrimination without pointing to a specific employment practice that produced the disparity.  Id. at 2555–56.

Finally and relevant to the instant case, the Court found that the anecdotal evidence offered by the plaintiffs in the form of 120 affidavits from current and former employees was insufficient to raise an inference of company-wide discrimination.  Id. at 2556.  In that regard, it distinguished its case from Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), where the Court inferred a company-wide policy of discrimination on the basis of "substantial statistical evidence of company-wide discrimination" and 40 anecdotes of discrimination representing "roughly one account for every eight members of the class."  Id.

In <u>Dukes</u>, by contrast, the plaintiffs "filed some 120 affidavits reporting experiences of discrimination — about 1 for every 12,500 class members — relating to only some 235 out of Wal–Mart's 3,400 stores." <u>Id.</u> Thus, the Court found that "[e]ven if every single one of these accounts is true, that would not demonstrate that the entire company 'operate [s] under a general policy of discrimination[.]'" <u>Id.</u> (quoting <u>Falcon</u>, 102 S.Ct. 2364).

Thus, <u>Dukes</u> suggests that in order to certify a company-wide class action, the plaintiff-employees must show either (i) an express company policy that violated the employee-plaintiffs' rights; or (ii) a practice that had sufficiently pervaded the company that it had become a *de facto* policy, which the plaintiffs can show by, among other things, anecdotal evidence that reaches a certain critical mass or comprehensive statistical analysis. <u>See</u> <u>Ruiz v. Citibank, N.A.</u>, 93 F. Supp. 3d 279, 289 (S.D.N.Y. 2015) ("<u>Dukes</u> suggested that in the absence of an express company policy that violated employee-plaintiffs' rights, plaintiffs could nonetheless obtain class certification to challenge a practice that had sufficiently pervaded the company that it had become a *de facto* policy . . . . [T]his evidence entails either (i) comprehensive statistical analyses or (ii) anecdotal evidence that reaches a certain critical mass.").

### 3. Predominance After *Comcast*

Predominance is satisfied "'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" <u>Roach</u>, 778 F.3d at 405.

Prior to the Supreme Court's decision in <u>Comcast Corp. v. Behrend</u>, ——U.S. —— –, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013), "it was 'well-established' in this Circuit that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)." <u>Id.</u> (quoting <u>Seijas v. Republic of Argentina</u>, 606 F.3d 53, 58 (2d Cir.2010)).

In <u>Comcast</u>, the plaintiffs filed a class-action antitrust suit claiming that Comcast's acquisition of sixteen competitor cable television providers violated the Sherman Act. 133 S. Ct. at 1430. The district court held that in order to meet the predominance requirement the plaintiffs had to show that: (1) the injury suffered by the class was "capable of proof at trial through evidence that [was] common to the class rather than individual to its members"; and (2) "the damages resulting from [the anticompetitive] injury were measurable on a class-wide basis through use of a common methodology." <u>Id.</u> On appeal, the Supreme Court found that an expert's testimony was not sufficient to establish that damages were measurable on a class-wide basis, and therefore, failed the predominance test established by the district court. <u>See id.</u> at 1435.

Subsequently, in <u>Roach v. T.L. Cannon Corp.</u>, *supra*, the Second Circuit read <u>Comcast</u> narrowly to mean that "damages questions should be considered at the certification stage when weighing predominance issues," but did not alter its prior holding that the fact that a case involves "individualized damages" does not "foreclose possibility of class certification under Rule 23(b)(3)." 778 F.3d at 408. Thus, <u>Roach</u> makes clear that in this Circuit, damages are relevant to but not dispositive of the predominance requirement.

## B. As to the Class Definition

In their present motion, the Plaintiffs seek to certify one class of "all non-exempt workers employed by U.S. Nonwovens in the State of New York at any time from November 14, 2006 until the present" based on the third, fourth, fifth, and seventh causes of action. (See the Pls.' Mot., Dkt. No. 170, at 1.)

In opposition, the Defendants assert that the Plaintiffs' motion should be denied because the class definition proposed by the Plaintiff is overbroad. (See the Defs.' Opp'n Mem. of Law, Dkt. No. 174, at 5–6.) According to the Defendants, that is because, the class definition proposed by the Plaintiffs does not account for "different positions (e.g., factory versus non-factory workers) or different job responsibilities, and do[es] not account for the individualized nature of the different claims asserted[.]" (Id. at 6.)

In reply, the Plaintiffs request that the Court modify the class definitions to include three sub-classes instead of one single class. (See the Pls.' Reply Mem. of Law, Dkt. No. 174, at 1.) These three sub-classes include (i) "[a]ll factory and warehouse workers at U.S. Nonwovens who were paid by the hour, and who were employed any time from November 14, 2016 to the present," and allege that the company failed to pay them straight wages (seventh cause of action) and overtime wages (third cause of action); (ii) "All factory and warehouse workers who were employed by U.S. Nonwovens at any time from November 14, 2006 to the present who received payment for straight wages or overtime more than seven days after the end of the workweek in which the straight wages or overtime were earned" (fourth cause of action); and (iii) "[a]ll non-exempt workers employed by U.S. Nonwovens in the State of New York at any time from November 14,

2006 to the present," who allege that they were not paid a spread of hours premium (fifth cause of action). (Id. at 2, 4, 6.)

It is well-established that "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993); see also Spencer v. No Parking Today, Inc., No. 12 CIV. 6323 (ALC) (AJP), 2013 WL 1040052, at *9 (S.D.N.Y. Mar. 15, 2013), report and recommendation adopted, No. 12 CIV. 6323 ALC AJP, 2013 WL 2473039 (S.D.N.Y. June 7, 2013) (same). Thus, the assertion by the Defendants that the proposed class definition is overbroad is not, by itself, a sufficient basis to deny the Plaintiffs' motion, as the Defendants contend.

Further, Fed. R. Civ. P. 23(c)(5) states, "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." See also In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 37 (2d Cir. 2009) ("We are confident in the lower court's wisdom and ability to utilize the available case management tools to see that all members of the class are protected, including but not limited to the authority . . . to certify subclasses pursuant to Rule 23(c)(5)); Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp., 993 F.2d 11, 14 (2d Cir. 1993) ("[T]he court is empowered under Rule [23(c)(5)] to carve out an appropriate class — including the construction of subclasses."). Thus, although not required to do so, the Court has discretion to divide a proposed class into sub-classes to ensure that all class members are protected.

Accordingly, in its discretion, the Court will use the sub-class definitions provided by the Plaintiffs in their reply memorandum as a starting point for assessing

whether the Rule 23(a) and 23(b) requirements have been met. See Flores v. Anjost Corp., 284 F.R.D. 112, 120 (S.D.N.Y. 2012) ("Because Plaintiffs rely for the most part on the third proposed subclass, I will use this as my starting point.").

## C. As to the First Proposed Sub-Class

As noted, the Plaintiffs seek to certify a sub-class of "[a]ll factory and warehouse workers at U.S. Nonwovens who were paid by the hour, and who were employed any time from November 14, 2016 to the present," and allege that the company failed to pay them overtime wages (third cause of action) and straight wages (seventh cause of action).

In opposition to the Plaintiffs' motion, the Defendants assert that the proposed sub-class fails because it does not meet the (i) typicality and commonality requirements set forth in Rule 23(a)(2) and (a)(3); (ii) the adequacy of representation requirements set forth in Rule 23(a)(4); and (iii) the predominance and superiority requirements set forth in Rule 23(b)(3). (See the Defs.' Opp'n Mem. of Law at 8–10, 14–19, 22–25.)

The Court agrees with the Defendants' assertion that the proposed sub-class fails to meet the commonality and predominance requirements, and therefore, need not reach the requirements of typicality, adequacy of representation, and superiority.

### 1. Commonality

As noted earlier, Dukes made clear that the commonality requirement is not satisfied merely by raising a "common contention" among class members, but rather, by showing that the "common contention" is of "such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 131 S. Ct. at 2551;

accord Sykes v. Mel S. Harris & Associates LLC, 780 F.3d 70, 80 (2d Cir. 2015) (same) (quoting Dukes, 131 S. Ct. at 2551).

Here, the proposed sub-class is comprised of current and former factory and warehouse workers who assert that the Defendants denied them overtime and "straight wages" under New York law.

As to overtime, New York regulations require qualifying employers to compensate employees for hours worked in excess of forty hours per work week at a rate not less than one-and-one-half times the regular rate of pay subject to certain exemptions not relevant here. 12 NYCRR § 142–2.2.

With respect to "straight wages," the proposed class members' claims are not premised on specific provisions of the FLSA or the NYLL but rather, are based on allegations that the Defendants breached alleged oral agreements with factory and warehouse workers by failing to compensate them for work they performed "off-the-clock."  (FAC at ¶¶ 188–192.)

Dukes suggests that in order to demonstrate commonality, the Plaintiff must show, by a preponderance of evidence, that there was an (i) explicit company-wide policy to encourage class members to work off-the-clock hours without compensating them; or (ii) barring an explicit policy, a de facto policy evidenced by "significant proof" that managers and supervisors uniformly exercised their discretion to deny class members compensation for their work.  See Ruiz, 93 F. Supp. 3d at 289 ("As a practical matter, employee-plaintiffs can rarely point to an explicit policy of their employer that is violative of their rights, including their rights under the relevant wage and hour laws.

Courts have recognized this fact, and proof of *de facto* policies has therefore become the coin of the realm.").

In that regard, the court finds <u>Fernandez v. Wells Fargo Bank, N.A.</u>, No. 12 CIV. 7193 (PKC), 2013 WL 4540521 (S.D.N.Y. Aug. 28, 2013) to be instructive. There, the plaintiff-employees sought to certify a Rule 23(b)(3) class of financial specialists and personal bankers based on allegations that their employers, two banks, denied them overtime and regular wages. <u>See</u> <u>id.</u> at *1, at *5–6. In so holding, the court first found that the plaintiffs failed to adequately allege an explicit policy on the part of management to deny employees overtime because "[n]owhere in plaintiffs' papers do they cite a specific, concrete, management directive concerning plaintiffs' off-the-clock work or any purported requirement not to record hours worked." <u>Id.</u> at *5.

The court then found that the plaintiffs' "anecdotal evidence concerning a *de facto* compensation policy [was] insufficient to establish commonality." <u>Id.</u> at *8. In particular, the plaintiffs submitted declarations of employees who stated that they were told by managers not to record overtime. <u>Id.</u> However, the court found the declarations had limited value "as proof of a common policy" because they "lack[ed] detail concerning the underlying communications," such as dates of when the communications took place or the "speakers or participants of the communications." <u>Id.</u>

The plaintiffs also provided anecdotal evidence that they were required to perform work at open and closing and during mandatory lunch breaks without pay. <u>See</u> <u>id.</u> at *11. Although the court found the evidence showed that some of the plaintiffs may "personally have not been compensated" for work performed during opening, closing, and during lunch, the court concluded that they failed to show a "common policy" of

denying them compensation during those periods.  See id.  Therefore, the court found that the plaintiffs failed to establish commonality and denied certification.  See id. at *6.

Similarly, in Ruiz v. Citibank, N.A., *supra*, the plaintiffs sought to certify a class action of current and former personal bankers alleging that their former employer, a bank, failed to pay them overtime. 93 F. Supp. 3d at 281.  The plaintiffs could not point to formal policies by the defendant regarding overtime and instead relied on anecdotal accounts to establish a *de facto* policy.  See id. at 291.  However, the court found that the declarations and testimony relied on by the plaintiffs were inconsistent on the question of overtime — for example, some of the class members stated that they were "paid overtime in at least some of the pay periods," while others did not.  Id. at 293, 295.   Furthermore, much of the testimony relied on by the plaintiffs was "well outside the bounds of what such deponents might personally know; such testimony consists of personal bankers stating what their branch managers told them about what their branch managers' superiors told their branch managers."  Id. at 293.  Accordingly, the court found the evidence in the record was "insufficient to demonstrate either common direction or a common mode of exercising discretion, and accordingly f[ound] an absence of common questions susceptible to classwide proof."  Id. at 295.

In this case, first, the Plaintiffs assert that the Defendants had a policy of paying employees only based on the shifts that they worked, and not according to when they punched into and out of the factory.  (See the Pls.' Reply Mem. of Law, Dkt. No. 181, at 6.)  Thus, they assert that the Defendants' compensation policy had the effect of denying employees compensation for work that they performed outside of their designated shifts. (See id.)

In opposition, the Defendants assert that even assuming such a policy existed, the policy is facially valid because employees generally only performed work during shifts, and therefore, the policy did not deny them any compensation. (The Defs.' Opp'n Mem. of Law, Dkt. No. 174, at 18–19.) The Court agrees.

The Plaintiffs are correct that the Individual Defendants testified that Nonwovens' general practice was to pay employees according to their shifts and not according to the when they punched into and out of work. However, there is no evidence showing that the Individual Defendants used this practice to deny employees overtime or regular wages.

To the contrary, Shervin Mehdizadeh, Nonwovens' chief executive officer, explained that employees often did not go straight to work when they punched in, and therefore, the purpose of paying them according to their shift schedule was to ensure that they were only paid for their work on the production line and not for lingering around the property before their shift started: "If the shift starts at 7 a.m. and they come a few minutes earlier, or an hour earlier because of dropoff and schedules, they will linger around the property. And then the machines start and the factory doors open at 7 . . . . They start getting paid at 7." (Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 131:22–132:5.)

Rody Mehdizadeh, Nonwovens' chief operating officer, described the company's general compensation practice similarly, "If you are working during the shift, you get paid for it. If there is no shift and you are just hanging around because you're waiting for a ride and then you leave and then you punch out because your ride got there, you were there for an extra 15 minutes, then you don't get paid for that." (Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 94:2–8.).

Furthermore, the testimony of the Individual Defendants indicates that the practice of paying employees according to their designated shift hours was flexible and could be changed at the direction of employees' supervisors.  For example, Shervin Mehdizadeh testified, "If [employees] come in earlier [than their shifts] because work is assigned to them, and that's far and few between — let's say their shift is at 7 and somebody else is assigned to come at 6:30 to turn on the boiler or something, that other person will get paid from 6:30 when he comes in, but the other person will get paid from 7."  (Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 131:22–132:12.)

 Thus, the fact that the Defendants had a general practice of paying employees based on their shift schedule does not, on its face, raise an inference that the policy resulted in denying factory and warehouse workers wages or overtime, as the Plaintiffs contend.  See Fernandez, 2013 WL 4540521 at *5 (finding that the plaintiffs failed to demonstrate commonality, in part, because "[n]owhere in plaintiffs' papers do they cite a specific, concrete, management directive concerning plaintiffs' off-the-clock work or any purported requirement not to record hours worked.").

The lack of an explicit policy requiring workers to work "off-the-clock" does not foreclose a finding of commonality if the Plaintiffs produce significant anecdotal evidence from which the Court can infer a *de facto* policy.  See Dukes, 131 S. Ct. at 2556 (noting that the Supreme Court has previously inferred a company-wide policy of discrimination based on "substantial statistical evidence of company-wide discrimination" and 40 anecdotal accounts of discrimination representing "one account for every eight members of the class." ) (citing Teamsters, 431 U.S. 324, 97 S.Ct. 1843).

However, the anecdotal evidence submitted by the Plaintiffs does not suggest that the Individual Defendants implemented a common *de facto* policy to deny compensation to their employees. For example, the Plaintiffs rely on statements in a declaration filed by Muido, a payroll clerk at Nonwovens from February 2011 to August 2011, and Montanez, a director for Human Resources at Nonwovens for one month during an unspecified period. (See the Pls.' Mem. of Law, Dkt. No. 171, at 12–14.) Both Muido and Montanez stated that employees often complained to them that they were missing hours from their paychecks. (Muido Decl., Dkt. No. 172, Ex. 15, at ¶ 25, Montanez Decl., Dkt. No. 172, Ex. 14, at ¶ 13.) However, they also stated that there was a process through which employees could raise theirs complaints with a supervisor, who after obtaining approval from one of the Individual Defendants, could then issue a check to employees for the missing hours. (Muido Decl., Dkt. No. 172, Ex. 15, at ¶¶ 23–29; Montanez Decl., Dkt. No. 172, Ex. 14, at ¶ 25.) Thus, if anything, the statements by Muido and Montanez suggest that the Defendants implemented a process to ensure that employees were generally paid for the hours that they claimed to have worked.

The Plaintiffs also rely on declarations by opt-in Plaintiffs and named Plaintiffs. For example, the Plaintiffs rely on the declaration of Luis Emanuel Lopez Montoya, who stated, "[s]ometimes I wouldn't be able to punch. At other times, four or five hours were missing from my paycheck. I would complain to my manager, who would say that he would look into it. But I was never paid for these hours." (Montoya Decl., Dkt. No. 172, Ex. 41.) Similarly, the Plaintiff relies on the declaration of Ramiro Cordova, who stated, "In 2003 a friend of my by the name of 'Efrain' worked at the factory. (not Efrain

Mendez).  Efrain worked for 22 days straight without being paid."  (Cardovo Decl., Dkt. No. 172, Ex. 11, at ¶ 11.)

However, these conclusory statements lack the kind of precision and detail from which the Court might infer a uniform policy on the part of the Individual Defendants to deny compensation to their employees.  See Fernandez, 2013 WL 4540521 at *9 ("The statements contained in these declarations constitute relevant evidence of a policy to require off-the-clock work and to limit overtime. However, their value as proof of a common policy is limited because of the lack of detail concerning the underlying communications.").

Further, both in their deposition testimony and in their declarations, many of the proposed class members admit to receiving overtime.  For example, in a declaration, opt-in Plaintiff Zoila Merlos stated, "[o]n one occasion 4-5 hours were missing from my paycheck.  I complained, and was not paid this overtime for another two weeks." (Merlos Decl., Dkt. No. 172, Ex. 40.)  Similarly, the named Plaintiff Mendez stated that although she was not paid overtime on one occasion, on another occasion, she was properly compensated after she complained to Mike Ortiz that "overtime hours were missing from [her] paycheck."  (Mendez Decl., Dkt. No. 172, Ex. 12, at ¶ 16.)

Similarly, the named Plaintiff Coiscou testified:

Q. Did you work overtime hours in U.S. Nonwovens?
A. Yes, several times I did work overtime.
Q. When you worked overtime, did the company pay you your overtime?
A. Yes, they never stopped paying me . . . .
Q. As we sit here today, do you believe that you are currently owed any overtime pay from the company?
A. No.

(Coicou Dep., Dkt. No. 174, at Tr. 29:23–30:21.)  Indeed, the Defendants have submitted payroll checks for many of the named and opt-in Plaintiffs indicating that the Defendants did not in fact pay them for overtime.  (See the Defs.' Opp'n Mem. of Law, Dkt. No. 174, Ex. I.)

Thus, the anecdotal evidence submitted by the Plaintiffs demonstrates that while the Defendants' payroll policies may have resulted in some employees not receiving compensation for all the hours they claimed to have worked, other employees did receive full compensation.  These inconsistencies suggest that there was no *de facto* or informal policy by the Individual Defendants to deny their factory and warehouse workers compensation.  Therefore, resolving the employees' claims would require the Court to conduct individual inquiries for each class member to determine the hours he or she legitimately worked and whether he or she was paid appropriate compensation.  Such individual determinations suggest a lack of commonality and render a class action inappropriate.  See Ruiz, 93 F. Supp. 3d at 295 ("A classwide determination of liability . . . depends upon demonstrating that appropriate policies have reliably translated themselves into inappropriate managerial behavior across the width and breadth of the class. Such evidence is simply not to be had from this record. All of the Sample Opt–Ins were paid overtime in at least some pay periods, with wide variation between them. While paying some overtime does not relieve Citibank of liability for the overtime it failed to pay, the variation suggests that the effects of Citibank's purported 'no overtime' policy were far from uniform.").

Next, the Plaintiffs contend that the Defendants had a policy of requiring "all factory and warehouse workers . . . to arrive at least 5 minutes prior to the beginning of

their scheduled shift." (The Pls.' Reply Mem. of Law, Dkt. No. 181, at 6–7.) According to the Plaintiffs, as a result of this policy, workers were allegedly not compensated for work they performed prior to their shifts. (See the Pls.' Mem. of Law, Dkt. No. 171, at 14–15.)

In response, the Defendants dispute that they require factory and warehouse workers to arrive at the factory five minutes prior to their shifts and as such, contend that determining whether employees performed pre-shift work will require the Court to conduct individual determinations for each class member. (The Defs.' Opp'n Mem. of Law, Dkt. No. 174, at 15–16.) Again, the Court agrees.

In support of their contention that the Defendants had a policy of requiring the Plaintiffs to come in five minutes before their shift and start working, the Plaintiffs rely solely on the declarations of eleven named and opt-in Plaintiffs. (See the Pls.' Mem. of Law, Dkt. No. 171, at 14.) However, only four of the eleven declarations relied on by the Plaintiffs even mention that such a policy existed, and those that do refer to such a policy, do so again in a conclusory manner.

Indeed, the sum total of the Plaintiffs' evidence that such a policy consists of the following statements: (i) the named Plaintiff Molino stated, "Workers who arrived 5-10 minutes early would be sent directly to their machine to begin working. This pre-shift work was never paid"; (ii) the opt-in Plaintiff Celenia Acosta stated, "I often arrived to work 15 minutes early and stayed five minutes late," Acosta Decl., Dkt. No. 172, Ex. 25, at ¶ 8; (iii) opt-in Plaintiff Evelin Garcia stated, "US Nonwovens has a policy that it does not pay for any pre-shift work. So even though employees sometimes arrive early to work, they are no paid for this time," Garcia Decl., Dkt. No. 172, Ex. 33, at ¶ 13; and (iv)

31

opt-in Plaintiff Heriberto Mendez stated, "Many times during my employment I arrived to work early, punched in, and began working. However U.S. Nonwovens has a policy of not paying for time worked before the beginning of an employee's shift," Heriberto Mendez Decl., Dkt. No. 172, at ¶ 9.

As discussed earlier, a few unsupported statements by class members, which do not specify details, such as who in management told them to come in early or reference specific occasions when they did so, is not sufficient to infer a company-wide compensation policy.

Furthermore, the Defendants offer testimony suggesting that to the extent employees came to work early, they did so voluntarily and not based on a common directive from management or their supervisors. For example, Awan testified, "[Y]ou have to realize these people come — they don't have cars. They take [a] ride or maybe come in one vehicle, like 10, 15 people, and they punch in the same time and sit[] in the lunchroom." (Awan Dep., Dkt. No. 174, Ex. J, at Tr. 174:21–175:9.)

In addition, Rody Mehdizadeh testified that to the extent that supervisors asked a factory worker to come to work early to perform a particular function, that worker would be compensated for doing so:

> You cannot assume that because someone punched in a little earlier that
> they were working. The answer to your question is if they were working,
> they got paid . . . . But if there were discrepancies, if you were working
> and you worked an extra 15 minutes every day and you see you are not
> getting paid, if after week by week you are just not getting paid those
> fifteen minutes, either you would complain or you would leave. Because
> people like getting paid for their work. So we have had those
> discrepancies, they would have brought it to me, I would have to sign off.

(Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 97:14–98:16.).  Shervin

Mehdizadeh testified similarly, "If [an employee] come[s] in earlier because work is

assigned to [him], . . . that . . .person will get paid from 6:30 when he comes in."

(Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 131:22–132:12.)

In light of the sparse evidence offered by the Plaintiffs and the testimony of the

Individual Defendants explicitly refuting that such a policy existed, the Court cannot

infer that the Defendants implemented a common policy requiring workers to perform

uncompensated work before their shifts.  See Fernandez, 2013 WL 4540521 at *11

("Plaintiffs have come forward with some evidence that they personally may not have

always been compensated for work performed at opening and closing, but not evidence

that these pay variations reflect a common New York policy capable of classwide

resolution."); Coleman v. Jenny Craig, Inc., No. 11CV1301 (MMA) (DHB), 2013 WL

6500457, at *8 (S.D. Cal. Nov. 27, 2013)  ("Plaintiff offers insufficient evidence that any

alleged off the clock work was due to a uniform policy or practice promulgated by Jenny

Craig companywide, rather than a result of an individual employee's own choices

regarding how to manage her time. As such, 'the individualized assessment necessary to

ascertain whether there were in fact any employees who were told to work off the clock

would not be susceptible to common proof.'") (quoting Washington v. Joe's Crab Shack,

271 F.R.D. 629, 642 (N.D. Cal. 2010)).

Finally, the Plaintiffs assert that the Defendants' policy of "automatically

deducting 30 minutes of unpaid time for lunch regardless of whether the employee was

actually able to take a bona fide meal period" violated the NYLL, and thus entitles

factory and warehouse workers to unpaid wages and overtime for all missed and interrupted breaks. (See the Pls.' Mem. of Law, Dkt. No. 171, at 13.)

In response, the Defendants assert that: (i) courts in this Circuit have recognized that "automatic meal deduction policies are not *per se* illegal" under the FLSA or the NYLL; and (ii) the Plaintiffs have failed to offer evidence suggesting that the Defendants had a uniform policy of encouraging employees to work through their meal breaks. (See the Defs.' Opp'n Mem. of Law, Dkt. No. 174, at 17–16.) Here too, the Court agrees.

It is undisputed that the Defendants required factory workers to take thirty minute meal breaks during their shifts and as a result, automatically deducted thirty minutes from their paychecks. However, the existence of such a policy, by itself, does not violate the FLSA or NYLL, as the Plaintiffs contend, because employees are not entitled to compensation during break periods when they are not working. See, e.g., Desilva v. N. Shore-Long Island Jewish Health Sys., Inc., 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014) ("[**C**]ourts in this circuit have recognized . . . [that] automatic meal deduction policies are not *per se* illegal."); Hinterberger v. Catholic Health Sys., 299 F.R.D. 22, 50 (W.D.N.Y. 2014) (finding a policy of automatic meal break deduction to be "facially valid"); Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 195 (N.D.N.Y. 2009) ("As plaintiffs in this case have acknowledged, the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA.").

Furthermore, the balance of the evidence suggests that managers did not encourage employees to work through their meal breaks in any kind of uniform way. For example, Shervin Mehdizadeh testified that the factory's general practice was to shut

down the production line during meal-breaks, making it impossible for factory employees to perform work during the breaks — "We shut down the machinery. We dim the lights. We turn off the electricity. The supervisors walk away. Power to the equipment goes down. The quality team is not there. They [the workers] go outside. They sit out. They go on the picnic table. They relax." (Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 134:12–17.) Awan described the general meal-time practice similarly, "The buzzer rings, there is a lunchtime. Everybody leaves the line and we also have some vendors and . . . the food truck outside. So they go and take lunch for half an hour at least." (Awan Dep., Moser Decl., Ex. 16, at Tr. 82:15–22.).

The Plaintiffs present some anecdotal evidence to support their assertion that employees often worked through their meal breaks. Specifically, the named Plaintiff Molina stated that on two occasions he took only a brief lunch period, Molina Decl., Dkt. No. 172, Ex. 10, at ¶¶ 8–9; and testimony by Rody Mehdizadeh suggests that on one occasion Jesus Ramos punched out for only four minutes for lunch but still had his full lunch period of 30 minutes deducted from his paycheck, Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at 99:19–100:2.

However, even if true, these three isolated incidents fall well-short of the "significant proof" required to establish a company-wide policy of encouraging employees to work off-the-clock during their meal-breaks. See Fernandez, 2013 WL 4540521, at *12 ("This evidence does not support plaintiffs' assertion that employees throughout the State of New York or the Northeast Region were subject to a common policy of denying compensation for time worked during lunch breaks. It may constitute some evidence that these individual plaintiffs may not have received full pay for work

performed on some lunch breaks, and that they were unable to personally override time entries. It is not meaningful evidence of a statewide or regional policy, and requires individualized analysis of each employee's circumstances."); Coleman v. Jenny Craig, Inc., No. 11CV1301 (MMA)(DHB), 2013 WL 6500457, at *9 (S.D. Cal. Nov. 27, 2013) ("Plaintiff's testimony establishes, at best, that her interactions with a particular supervisor, at a particular centre location, resulted in missed meal breaks on some occasions. But it does not support Plaintiff's claim of a companywide policy or practice of forcing employees to miss meal breaks in the name of upholding customer service standards.").

In sum, the evidence presented to the Court does not establish common wage and hours practices resulting in a class of employees not being paid their regular wages or overtime wages. Therefore, the Plaintiffs have failed to show that an overtime and straight wages sub-class satisfied the commonality requirement.

### 2. Predominance and Superiority

The Court notes that certification of an overtime and straight wages sub-class is also inappropriate under Rule 23(b)(3). As noted above, Rule 23(b)(3) requires the movant to show by a preponderance of the evidence that (1) "[c]ommon questions ... 'predominate over any questions affecting only individual members'" and (2) class resolution must be "'superior to other available methods for the fair and efficient adjudication of the controversy.'" Amchem Products, Inc. v. Windsor, 521 U.S. 591, 619, 117 S. Ct. 2231, 2248, 138 L. Ed. 2d 689 (1997).

"Like the commonality inquiry, a court examining predominance must assess (1) the 'elements of the claims and defenses to be litigated'; and (2) 'whether generalized

evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief.'" <u>Johnson v. Nextel Commc'ns Inc.</u>, 780 F.3d 128, 138 (2d Cir.2015) (quoting <u>McLaughlin on Class Actions</u> § 5:23).  However, predominance requires a further inquiry "into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." <u>Id.</u>  Accordingly, the predominance inquiry is "more demanding than Rule 23(a)." <u>Comcast Corp.</u>, 133 S.Ct. at 1432.

As explained above, the evidence shows that the Defendants had facially lawful compensation policies with respect to regular wages and overtime.  Thus, the Court would have to engage in individualized inquiries to determine whether supervisors deviated from those policies to require factory and warehouse workers to perform overtime work, work before or after their shifts, or work during meal-time breaks for which they were not properly compensated.  The Court finds that these individual inquiries would predominate over any common questions among class members because they relate to the central question driving the Plaintiffs' third and seventh causes of action — namely, did the Defendants fail to pay each class member the overtime and regular wages to which they were entitled.

Accordingly, the Plaintiffs have also failed to meet the provisions of Rule 23(b)(3) for purposes of this sub-class. <u>See</u> <u>Coleman</u>, 2013 WL 6500457 at *12 (finding that the plaintiffs failed to meet Rule 23(b)(3) because the defendant "has facially lawful compensation policies" and therefore, "[t]he Court would have to engage in individualized inquiries to determine whether certain deviated from those policies, and if so, why."); <u>Fernandez</u>, 2013 WL 4540521 at *14 ("Plaintiffs have failed to come forward

with evidence sufficient to establish predominance for many of the reasons discussed in regard to their failure to establish commonality. Without meaningful evidence of a New York-wide policy at Wachovia or Wells Fargo, a determination of liability turns on highly individualized, employee-by-employee analysis of what they were told by management and how any time-recording practices were applied.").

Below, the Court will address the other sub-classes proposed by the Plaintiffs.

## D. As to the Second Proposed Sub-Class

The Plaintiffs also seek to certify a sub-class of "[a]ll factory and warehouse workers who were employed by U.S. Nonwovens at any time from November 14, 2006 to the present who received payment for straight wages or overtime more than seven days after the end of the workweek in which the straight wages or overtime were earned." (The Pls.' Reply Mem. of Law, Dkt. No. 181, at 4.)

The subclass-members' claims are premised on the "frequency of payments" provision NYLL § 191(1)(a)(i), which states in relevant part, "[a] manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned." N.Y. Lab. Law § 191. "'If an employer wrongfully withholds earned wages [pursuant to NYLL§ 191], an employee may sue to recover the wages, as well as (1) prejudgment interest; (2) reasonable attorney's fees; (3) costs of the suit; and (4) liquidated damages of 25% of the withheld wages, if the employer willfully withheld the wages.'" Wing Kwong Ho v. Target Const. of NY, Corp., No. 08-CV-4750 KAM RER, 2011 WL 1131510, at *14 (E.D.N.Y. Mar. 28, 2011) (quoting Dreyfuss v. elelecare Global Solutions–US, Inc., 08 Civ. 1115, 2010 WL 4058143, at *5 (S.D.N.Y. Sep.30, 2010)); see also N.Y. Lab. Law § 198(1-a); Gonzales v. Gan Israel Pre-Sch., No. 12-CV-

06304 MKB, 2014 WL 1011070, at *14 (E.D.N.Y. Mar. 14, 2014)("If an employer wrongfully withholds earned wages under NYLL § 191, an employee may sue to recover the wages, prejudgment interest, as well as liquidated damages of twenty-five percent of the withheld wages.").

The Plaintiffs assert that the proposed class meets the Rule 23(a) commonality and Rule 23(b)(3) predominance requirements because the Defendants' payroll process resulted in factory and warehouse employees regularly receiving paychecks that did not fully compensate them for the hours that they worked. (See the Pls.' Reply Mem. of Law, Dkt. No. 181, at 4–5.)

In response, the Defendants assert that (i) their payroll policies did not violate NYLL § 191 because it is undisputed that factory and warehouse employees received paychecks within seven days of performing work; and (ii) therefore, there is no common policy which ties together the proposed class members' § 191 claims. (The Defs.' Mem. of Law, Dkt. No. 174, at 13–14.) Again, the Court agrees.

As described earlier, to satisfy commonality, the movant must show by a preponderance of evidence that there is a "common contention . . . of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 131 S. Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L. Rev. 97, 131–132).

Furthermore, as noted, if the movant fails to meet the commonality standard of Rule 23(a), it necessarily follows that he or she also fails to meet the more demanding predominance and superiority requirements of Rule 23(b)(3). See Comcast Corp., 133 S. Ct. at 1432 ("If anything, Rule 23(b)(3)'s predominance criterion is even more

demanding than Rule 23(a).") (citing <u>Amchem</u>, 521 U.S. at 619); <u>Callari</u>, 307 F.R.D. at 82 ("The Court finds that the Plaintiff has failed to meet the Rule 23(a) requirement of commonality, typicality, and adequacy of representation. Therefore, it follows that the proposed class also fails to meet the more demanding requirements of Rule 23(b)(3).").

The central contention for each class members' NYLL § 191(1)(a)(i) claim is that the Defendants paid them "later than seven calendar days after the end of the week in which [his or her] wages [were] earned."

However, the Plaintiffs have failed to offer any evidence that this contention is subject to class-wide proof.

In particular, it is undisputed that the Defendants have always had a policy pursuant to which (i) the payroll period runs from Monday to Sunday; (ii) on Tuesday of the following week, the payroll department processes payroll; and (iii) on Thursday of the same week, the payroll department issues checks to every employee for the wages earned in the prior week. (Awan Dep., Moser Decl., Ex. 16, at Tr. 67:13–22; Muido Decl., Dkt. No. 172, Ex. 15, at ¶¶ 13–23.)

Therefore, under this policy, workers were paid within seven days of the end of the week in which they earned their wages. Accordingly, the policy is compliant with the plain language of NYLL § 191.

The Plaintiffs take issue with the fact that prior to this lawsuit, the Defendants did not verify their employees' payroll hours prior to issuing paychecks and therefore, to the extent employees' paychecks were missing hours, they had to wait until after the seven-day period set forth in NYLL § 191 to complain and ultimately get compensated for their missing hours. (The Pls.' Mem. of Law, Dkt. No. 171, at 8–9.)

However, NYLL § 191 does not require employers to verify their employees' hours prior to issuing a paycheck. Rather, the provision requires only that employers pay manual workers "not later than seven calendar days after the end of the week in which [their workers'] wages are earned." In other words, the provision is reserved for cases in which employers do not remit a paycheck to workers within the seven-day period required by NYLL § 191. See Wing Kwong Ho, 2011 WL 1131510 at *14 (granting judgment in favor of a plaintiff on his NYLL § 191 claims because the court found the "plaintiff has established that between April 6, 2007 and November 21, 2007, defendant Zhu failed to pay him his earned wages weekly or semi-monthly, and failed to pay his earned wages within two weeks of his termination from Target Construction."); Cuzco v. Orion Builders, Inc., No. 06 CIV.2789 (KMW) (THK), 2010 WL 2143662, at *4 (S.D.N.Y. May 26, 2010) ("Defendants paid wages every two weeks (rather than weekly) and paid these wages no earlier than two weeks after the end of the period in which those wages were earned. These facts are undisputed. Therefore, Plaintiffs and members of the certified class are entitled to summary judgment on their claims that Defendants violated the timely payment provisions of NYLL § 191.").

The Plaintiffs do not point to, nor can the Court identify, any cases where a court found an employer liable under NYLL § 191 for issuing a paycheck that did not include all of the hours an employee claim to have worked. Thus, the fact that the Defendants had a policy for issuing paychecks that may have resulted in some employees complaining about missed hours does not appear to be relevant to NYLL § 191, let alone establish **a** common thread among class members sufficient to justify a class action premised on their NYLL § 191 claims.

Even if a delay in paying employees for "missed hours" was relevant to NYLL § 191, the Plaintiffs again rely exclusively on conclusory and vague statements in declarations and deposition testimony to establish that the Defendants implemented a policy to designed to cause such a delay.

For example, the named Plaintiff Mendez testified as follows:

> Q. How many times in total did you complain to Mike Ortiz about hours that you thought you were missing?
> A. About five times.
> [. . . .]
> Q. In the approximately five times that you say that you complained to Mike Ortiz, did you ultimately get paid for the missing time that you were complaining about?
> A. Well, some hour, yes, they were paid. Some hours were not paid.

(Mendez Dep., Moser Decl., Ex. 20, at Tr. 20:23–21:4.)

Similarly, the named Plaintiff Cardova stated, "From the very beginning of my employment in 2001 until I was fired in 2013, there were continuous complaints from workers regarding overtime hours missing from their paychecks."  (Cardova Decl., Dkt. No. 172, Ex. 11, at ¶ 7.)

The other declarations relied on by the Plaintiffs contain nearly identical statements:  (i) Amanda Alicia Rivera Argueta stated, "Many times there hours missing my checks and the checks of my-coworkers," Rivera Decl., Dkt. No. 172, Ex. 28, at ¶ 10; (ii) Jose Vicente Del Cid stated, "On three occasions there were overtime hours missing from my check," Del Cid., Dec., Dkt. No. 172, Ex. 30, at ¶ 9; and  (iii) Melvin Amaya Marquez stated, "Approximately 5–8 times during my employment, I noticed that overtime hours were missing from my check," Marcquez Decl., Dkt. No. 172, Ex. 37, at ¶ 11.

At most these declarations establish that on some occasions the opt-in and named Plaintiffs received paychecks with missing hours. They do not demonstrate that the Defendants systematically abused the payroll system or withheld wages from factory and warehouse workers in a uniform manner. See Ruiz, 93 F. Supp. 3d at 290 ("Citibank's timekeeping system, which allowed branch managers to edit and approve timesheets, may have initially lacked certain desirable checks that were later added, but Plaintiffs have not demonstrated that it was systematically abused or designed to facilitate such abuse.").

Accordingly, the Court finds that the Plaintiffs have failed to show by a preponderance of evidence that the Defendant had an explicit or *de facto* policy of delaying payment to factory and warehouse workers. Thus, determining liability on the class members' NYLL § 191 claims would require the Court to make individual determinations with respect to each class member as to when the employee received his or her paycheck, and whether the employee was ultimately compensated for all the hours he or she worked in a timely manner. For this reason, the Plaintiffs second sub-class also fails to meet both the commonality and predominance requirements. Therefore, the Court also denies the Plaintiffs motion to certify the second proposed sub-class.

**E. As to the Third Proposed Sub-Class**

Finally, the Plaintiffs seek to certify a sub-class of "[a]ll non-exempt workers employed by U.S. Nonwovens in the State of New York at any time from November 14, 2006 to the present" who allege that they were not paid a "spread of hours premium." (The Pls.' Reply Mem. of Law, Dkt. No. 181, at 2.)

As noted earlier, New York regulation requires that "[a]n employee . . . receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which . . . the spread of hours exceeds 10 hours." 12 NYCRR § 142-2.4. "Spread of hours" is, in turn, defined as "the interval between the beginning and end of an employee's workday" and "includes working time plus time off for meals plus intervals off duty." Id. at § 142-3.16.

The Defendants assert that the Court should deny the Plaintiffs' motion because they have failed to satisfy the commonality and adequacy of representation requirements of Rule 23(a), as well as the predominance requirement of Rule 23(b).

As set forth below, the Court disagrees and finds that certification as to this sub-class is warranted.

**1. Numerosity**

Rule 23(a)(1) requires the movant to show that "the class is so numerous that joinder of all class members is impracticable." "[N]umerosity is presumed where a putative class has forty or more members." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 252 (2d Cir. 2011) (parenthetically quoting Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)). The Plaintiffs assert — and the Defendants do not dispute — that the proposed class consists of 1,238 employees based on the opt-out mailing list provided by the Defendants in the context of the collective action. Therefore, numerosity is satisfied. See Fonseca v. Dircksen & Talleyrand Inc., No. 13 CIV. 5124 (AT), 2015 WL 5813382, at *2 (S.D.N.Y. Sept. 28, 2015) ("Plaintiffs assert—and Defendants do not dispute—that 'based on the list of [t]ipped [e]mployees

who worked at the River Café from April 11, 2008 until April 11, 2014 . . . there are more than 180 potential [c]lass [m]embers.' . . . Numerosity, therefore, is satisfied.").

### 2. Commonality

The Plaintiffs assert that the proposed sub-class satisfies commonality because they assert that from 2006 to at least "one year after the commencement of this lawsuit," the Defendants had a policy whereby it did not pay a spread of hours premium to any of their non-exempt employees.  (<u>See</u> the Pls.' Mem. of Law, Dkt. No. 171, at 21.)

In support, the Plaintiffs point to the testimony of Rody and Shervin Mehdizadeh, both of whom testified that they were not aware of the spread of hours requirement until the commencement of this lawsuit.  (<u>See</u> Rody Mehdizadeh Dep., Moser Decl., Ex. 17, at Tr. 30:3–19; Shervin Mehdizadeh Dep., Moser Decl., Ex. 18, at Tr. 48:3–15.)  In addition, the Plaintiffs rely on the Defendants' responses to the Plaintiffs' supplemental interrogatories in which the Defendants stated:

> [A]t least forty individuals had (during the relevant time period) worked a spread of hours in excess of ten in at least one day and had not been paid a spread of hours premium for such day . . . [T]o the extent the Named Plaintiffs worked a spread of hours in excess of ten [hours] in at least one day prior to the commencement of this lawsuits, Defendants do not believe that such Named Plaintiffs were paid a spread of hours premium for such day.

(The Defs.' May 12, 2015 Responses to the Pls.' Supp. Interrogs. at ¶¶ 16, 17.)

They also point to testimony from Awan and Muido stating that prior to the initiation of this lawsuit, the Defendants' payroll system was not programmed to pay workers the spread of hours premium.  (<u>See</u> Awan Dep., Moser Decl., Ex. 16, at Tr. 61:9–63:16; Muido Decl., Dkt. No. 172, Ex. 15, at ¶ 32.)

In their opposition memorandum, the Defendants do not appear to dispute that prior to 2012, Nonwovens did not have a policy in place to pay hourly workers a spread of hours premium.  (See the Defs.' Opp'n Mem. of Law, Dkt. No. 174, at 20–21.) Rather, they assert that the proposed class definition of "[a]ll non-exempt workers employed by U.S. Nonwovens in the State of New York at any time from November 14, 2006 to the present" is overly broad because it includes non-minimum wage workers who they allege are not due spread of hours wages.  (Id.)  In addition, they assert that after 2012, the Defendants put in place a system to pay workers spread of hours wages, and therefore, the relevant period for the proposed class — which runs to the date of this decision — is also overly broad.  (Id.)  The Defendants' arguments misses the mark for a number of reasons.

First, as noted previously, following Dukes, in order to satisfy the commonality requirement, the movant must demonstrate that class members share a comment contention that "is of such a nature that it is capable of classwide resolution" and is "an issue that is central to the validity of each one of the claims in one stroke."  131 S. Ct. at 2551.

The common issue that is central to the validity of each one of the class members' spread of hours claims is whether the Defendants had a policy of not paying a spread of hours premium.  In that regard, the Plaintiffs have submitted evidence that at least prior to 2012, the Individual Defendants lacked familiarity with the concept of spread of hours wages, as well as testimony from Awan and Muido, the two employees who were responsible for the Defendants' payroll process, that there was no system in place to pay employees a spread of hours premium prior this lawsuit.  Furthermore, the Defendants

admitted in discovery that they have identified at least forty employees who during the relevant period "worked a spread of hours in excess of ten in at least one day and had not been paid a spread of hours premium for such day."

In spread of hours cases, courts in this Circuits have found that similar evidence sufficiently established a common policy for the purpose of the Rule 23(a) commonality requirement.  See, e.g., Flores v. Anjost Corp., 284 F.R.D. 112, 126 (S.D.N.Y. 2012) ("Plaintiffs demonstrate commonality and typicality with respect to all non-exempt employees for their spread of hours and wage statement claims. Defendants' lack of familiarity with the concept of spread of hours wages, along with Plaintiffs' affidavits and pay stubs showing that such payments were not made, is amenable to resolution in a class action."); Poplawski v. Metroplex on the Atl., LLC, No. 11-CV-3765 (JBW), 2012 WL 1107711, at *7 (E.D.N.Y. Apr. 2, 2012) ("In wage cases, the commonality requirement is usually satisfied where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices.").

Second, the question of whether non-minimum wage workers are entitled to a spread of hours premium is an open question in this Circuit.  Most district courts have held that the provision only applies to employees earning a minimum wage.  See, e.g., Baltierra v. Advantage Pest Control Co., No. 14 CIV. 5917 (AJP), 2015 WL 5474093, at *6 (S.D.N.Y. Sept. 18, 2015) ("Most courts in this Circuit have ruled that New York's spread of hours provision applies only to employees earning minimum wage.") (collecting cases); Pinovi v. FDD Enterprises, Inc., No. 13 CIV. 2800 (GBD) (KNF), 2015 WL 4126872, at *5 (S.D.N.Y. July 8, 2015) ("'[R]ecent case law has been nearly unanimous that the spread-of-hours requirement extends only to workers paid at the

minimum wage level.'") (quoting <u>Williams v. Tri–State Biodiesel, L.L.C.</u>, No. 13 Civ. 5041 (GWG), 2015 WL 305362, at *16 (S.D.N.Y. Jan. 23, 2015)); <u>see also</u> <u>Sosnowy v. A. Perri Farms, Inc.</u>, 764 F. Supp. 2d 457, 473 (E.D.N.Y. 2011) ("Based on the Court's own reading of the statute, the Court agrees with the cases that find that the explicit reference to the 'minimum wage' in section 142–2.4 indicates that 'the spread-of-hours provision is properly limited to enhancing the compensation of those receiving only the minimum required by law.'") (quoting <u>Almeida v. Aguinaga</u>, 500 F. Supp. 2d 366, 369 (S.D.N.Y. 2007)).

However, at least one district court has held that all employees are entitled to a spread of hours wage, including those who earn above the minimum wage. <u>See</u> <u>Doo Nam Yang v. ACBL Corp.</u>, 427 F. Supp. 2d 327, 339 (S.D.N.Y. 2005) (concluding that the spread of hours provision applies to employees who make more than the minimum wage).

In any event, even if some class members who received more than the minimum wage are not entitled to spread of hours wages, that fact is not enough to defeat commonality. That is because there is a common policy going to the Defendants' liability — namely the Defendants' admissions that it did not pay spread of hours wages prior to this lawsuit — and therefore, the question of whether some class members are entitled to spread of hours wages primarily goes to the issue of damages. The Second Circuit in <u>Roach</u> recently re-affirmed its prior holding that the possibility that a court may be required to make individual determinations as to each class member's damages does not, by itself, defeat commonality or render class certification in appropriate. <u>See</u> <u>Roach</u>, 778 F.3d at 405 ("Prior to the Supreme Court's decision in <u>Comcast</u>, it was 'well-

established' in this Circuit that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification" under Rule 23(b)(3) . . . . We do not read <u>Comcast</u> as overruling these decisions.").

Accordingly, the fact that the proposed class consists of both minimum wage and non-minimum wage employees does not defeat commonality, as the Defendants contend. <u>See</u> <u>Morris v. Alle Processing Corp.</u>, No. 08CV-4874 (JMA), 2013 WL 1880919, at *11 (E.D.N.Y. May 6, 2013) ("[T]he presence of both minimum wage and above-minimum wage employees in the proposed class is insufficient to defeat commonality and typicality."); <u>Flores</u>, 284 F.R.D. at 126 ("Specifically, Defendants argue that the proposed class encompasses many employees who earn over the minimum wage, and employees who earn over minimum wage are not entitled to spread of hours wages . . . . As a matter of law, this is not wholly correct. But more important to our purposes on this motion, this is not the type of 'unique defense' that bars collective certification of a class action, especially when there is evidence of a common policy.").

Third, the question of whether the Defendants began to pay the spread of hours premium after this lawsuit was commenced in 2012 is also a question that goes primarily to damages and not to liability. Further, as the question can be resolved easily by reviewing a class member's payroll records to determine if he or she was in fact paid a spread of hours wage, it does not affect the commonality requirement, nor does it render the case unsuitable for class treatment. <u>See</u> <u>Flores</u>, 284 F.R.D. at 126 ("There may be questions regarding whether the named Plaintiffs were due spread of hours pay for all weeks prior to January 1, 2011 . . . . This mechanical question can be easily resolved during a damages inquiry, if one is required, by resort to Defendants' pay records.").

In sum, the Court finds that the Plaintiffs have established a common policy by the Defendants of not paying employees spread of hours wages and therefore, the Court finds that the proposed class meets the commonality requirement.

### 3. Typicality

As noted, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This requirement is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993). "[M]inor variations in the fact patterns underlying individual claims" does not defeat typicality. Id. at 937. However, "'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'" Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir.1990)).

In the context of wage and hour litigation, most courts have held that the "[t]he commonality and typicality requirements of Rule 23(a) tend to merge" and therefore, have found that both requirements are satisfied where the movant establishes that class members were subject to a common illegal policy. See Dukes, 131 S. Ct. at 2551 n.5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge.'") (quoting Falcon, 457 U.S. at 157–158, n. 13)); Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality and typicality requirements tend to merge into one another, so that similar considerations

animate analysis of Rules 23(a)(2) and (3).”); <u>Morris</u>, 2013 WL 1880919 at *9 (“The

Court finds that plaintiffs have satisfied the commonality and typicality requirements.

The named plaintiffs’ claims and the proposed class members’ claims arise from the

same course of conduct (defendants’ practice and policy of failing to pay wages and

overtime), raise common issues of law and fact . . . , and are based on the same legal

theories (violations of NYLL).”).

Therefore, for similar reasons discussed above with regard to commonality, the

Court finds that the proposed class also satisfies the typicality requirement.  All of the

class members arise from the same policy, or lack thereof, by the Defendants not to pay

their hourly employees spread of hours wages.  Liability for each class member’s claims

will ultimately be determined in large measure by proof of that common policy.  And,

while some class members may not be entitled to spread of hours wages because they are

not minimum wage employees or they did not work a spread of hours in excess of ten

hours on a particular day, those issues can be addressed easily by resorting to the

Defendants’ payroll records.  Accordingly, the Court finds that the proposed class

satisfies typicality.

### 4. Adequacy of Representation

Rule 23(a)(4) requires that “the representative parties will fairly and adequately

protect the interests of the class.”  “Generally, adequacy of representation entails inquiry

as to whether: 1) plaintiff’s interests are antagonistic to the interest of other members of

the class and 2) plaintiff’s attorneys are qualified, experienced and able to conduct the

litigation.”  <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 222 F.3d 52, 60 (2d Cir.

2000).

With respect to the first requirement, the Supreme Court has noted that the question of whether the named representatives' interests are in line with the interests of other class members also tends to merge with the commonality and typicality requirements. Dukes, 131 S. Ct. at 2551 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.'") (quoting Falcon, 457 U.S. at 157–158, n. 13) (emphasis added).

Here, both the named Plaintiffs and the class members will rely on the same proof in making their claims — namely, proof of the Defendants' general payroll policies with respect to spread of hours compensation and copies of the Defendants' payroll records to establish that they were not paid for working spread of hours in excess of ten hours. As a result, the Court finds that the named Plaintiffs' claims and the evidence they will rely on in proving their claims is similar to the claims and evidence that the other class members will rely on. Accordingly, the Court finds that the named Plaintiffs' interests in pursing their spread of hours claims are in line with other class members' interests in pursuing the same claims.

The Defendants do not appear to dispute that the interests of the named Plaintiffs are not antagonistic to the interests of the other class members. Rather, they point to the

testimony of Mendez, one of the eight named Plaintiffs, and asserts that he "appear[ed] to have little understanding of what this case is about," and therefore does not have enough knowledge to be an adequate class representative.  (The Defs.' Opp'n Mem. of Law, Dkt. No. 174. at 22–23.)  Again, not so.

Courts in this circuit have described the knowledge requirement for being a class representative as low and generally found that it is satisfied by showing a general knowledge of the case and a wiliness to pursue litigation on behalf of the class.  See, e.g., Baffa, 222 F.3d at 61 (noting that the court "disapprov[e]s of attacks on the adequacy of a class representative based on the representative's ignorance."); Flores, 284 F.R.D. at 129 ("Knowledge of all the intricacies of the litigation is not required and several courts have found that general knowledge of what is involved is sufficient.") (quoting 7A Fed. Prac. & Proc. Civ. § 1766 (3d ed.)); Morangelli v. Chemed Corp., 275 F.R.D. 99, 120 (E.D.N.Y. 2011), amended on reconsideration on other grounds (July 8, 2011) ("A proposed representative meets this [knowledge] requirement where the record shows a willingness and ability to pursue the litigation on behalf of the class, and understanding of the subject of the litigation.").

Stated another way, "class representative status may properly be denied 'where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"  Baffa, 222 F.3d at 61 (quoting Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077–78 (2d Cir. 1995)).

Here, there is no question that Mendez and the other seven named Plaintiffs have shown a willingness pursue this litigation.  They have all filed sworn declarations in

support of their present motion and complied with discovery requests from the

Defendants for depositions and responses to interrogatories, actions which show that they

are actively participating in this litigation.  See Flores, 284 F.R.D. at 130 ("More

importantly, the sworn affidavits of named Plaintiffs clearly demonstrate that Plaintiffs

are familiar with, and are actively participating in, this litigation."); Hamelin v. Faxton-

St. Luke's Healthcare, 274 F.R.D. 385, 396 (N.D.N.Y. 2011) ("The affidavits of the

named plaintiffs exhibit sufficient knowledge concerning the class claims and no class

members have interests antagonistic to one another."); Leone v. Ashwood Fin., Inc., 257

F.R.D. 343, 352 (E.D.N.Y. 2009) (finding that the named plaintiff was an adequate class

representative, in part, because he "submitted an affidavit stating that she understands the

responsibilities of a class representative and that she has knowledge of this action.").

Furthermore, Mendez showed a general understanding of this case in his

deposition testimony:

> Q. What do you think you were suing about for or about?
> [….]
> A. In response to that, there were hours missing from work. We were
> missing hours of work. It was not only me but several people who work
> there because when Mike Ortiz would give us our check, we would check
> the hours and there were hours missing.

(Mendez Dep., Dkt. No. 174, Ex. E, at Tr. 18:5–24.)

The fact that Mendez did not refer to every precise regulation that the Defendants

allegedly violated in his testimony does not render him unqualified.  Nor does the fact

that he exhibited some confusion initially over what an opt-in form is and why the case

was initiated.  See Morangelli, 275 F.R.D. at 120 ("Although I am concerned that one of

the plaintiffs has not read the complaint, I am satisfied that all of the representatives

understand the nature of the lawsuit and have all shown a willingness to pursue it as

demonstrated by their cooperation in discovery. That they are not as familiar with the pleadings as they could be is outweighed by their basic understanding of the case.").

Indeed, to find otherwise would be "inappropriate where, as here, the class comprises relatively low-skilled laborers. Such inflexibility runs counter to a principal objective of the class action mechanism — to facilitate recovery for those least able to pursue an individual action." Noble v. 93 Univ. Place Corp., 224 F.R.D. 330, 344 (S.D.N.Y. 2004).

Accordingly, the Court finds that the eight named Plaintiffs would be adequate representatives of the class members.

As to the second requirement, Steven J. Moser, Esq. ("Moser"), the attorney for the named Plaintiffs, submits an affidavit indicating that he is fluent in English and Spanish and can therefore converse with all of the class members, including those whose first language is Spanish. In addition, he indicates that he has significant experience in labor and employment litigations and has served as class counsel for a number of wage and hour class actions. (See Moser Decl., Dkt. No. 172, at ¶ 3.) Based on these qualifications, which are undisputed by the Defendants, the Court finds Moser to be an adequate class counsel.

Accordingly, the Court finds that the Plaintiffs have demonstrated adequacy sufficient to satisfy the requirements of Rule 23(a)(4).

**5. Predominance**

Rule 23(b)(3) requires movant to demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members." As explained earlier, predominance is a more demanding standard than

commonality because it requires the movant show not only that comment contentions central to the class members' claims "are subject to generalized proof," but also that those "particular issues are more substantial than the issues subject only to individualized proof." Roach, 778 F.3d at 405 (quoting Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.), 729 F.3d 108, 118 (2d Cir. 2013) (internal quotation marks omitted)).

The Plaintiffs assert that the Defendants' policy prior to this litigation of not compensating employees for spread of hours wages is the "central issue in this case" and therefore, predominates over issues subject to individualized proof, such as each class members' damages. (See the Pls.' Mem. of Law, Dkt. No. 171, at 22–24.)

In response, the Defendants mostly renew the arguments they made with respect to commonality — namely, that because there is "documentary evidence that there were individuals who were paid the spread of hours premium during the period referenced by the Plaintiffs[,] [o]ne needs to look at individualized circumstances for anyone who did not receive spread of hours during that entire period[.]" (The Defs.' Opp'n Mem. of Law, Dkt. No. 174, at 24.)

In this regard, the Court agrees with the Plaintiffs. As already discussed in the context of commonality, the Defendants have conceded in discovery and in deposition testimony that prior to this litigation they did not pay employees spread of hours wages. This proof will be central to every class members' claim because it may at least, in part, establish liability on the part of the Defendants.

The Court will have to conduct individual inquiries with respect to each class member — namely, (i) whether he or she was an hourly employee that qualifies for

spread of hours wages; (ii) whether he or she worked a spread of hours more than ten hours in one day; and (iii) whether he or she was adequately compensated for those hours.  However, numerous courts have held that these inquiries are relevant to damages and can be decided by mechanically referring to a defendant's payroll records, and therefore do not threaten to become a focus of the litigation.  See, e.g., Morris, 2013 WL 1880919 at *12 ("[P]redominance is satisfied where, as here, the 'central issue' is whether defendants had a 'uniform policy or practice' of denying wages for all hours worked, overtime wages, and spread of hours compensation.") (citations omitted); Flores, 284 F.R.D. at 130-31 (finding that predominance was satisfied because "[t]he key issue regarding this class is whether Defendants had general policies to deny its employees spread of hours pay and to make its employees pay for their uniforms. Plaintiffs have adduced sufficient evidence that these common policies exist. Resolution of these questions — and thus Defendants' liability — will depend on common proof."); Garcia v. Pancho Villa's of Huntington Vill., Inc., 281 F.R.D. 100, 108 (E.D.N.Y. 2011) ("Rather, predominance is satisfied where, as here the central issue is whether the defendants had a uniform policy or practice of denying overtime and spread-of-hours compensation to its employees . . . . Although individual questions as to damages may exist, 'common legal issues related to the members' entitlement to overtime wages and the proper measure of such wages clearly predominate over these relatively simple, mechanical calculations.") (internal quotation marks and citations omitted); Alonso v. Uncle Jack's Steakhouse, Inc., No. 08 CIV. 7813 (DAB), 2011 WL 4389636, at *5 (S.D.N.Y. Sept. 21, 2011) ("Here, although individual inquiries may be necessary as to the amount of hours worked for purposes of the overtime claim, all other aspects of this case are subject to generalized

proof and applicable to the class as a whole. The issues of liability are uniform for the class, and predominate over the individualized inquiries into damages that might eventually be necessary if liability is proven.")

Accordingly, the Court is confident that the individual questions raised by the Defendants will not predominate over questions common to the class members. Therefore, the Plaintiffs have satisfied the predominance requirement.

### 6. Superiority

The last question that the Court must address under Rule 23(b)(3) is whether "class action is superior to other available methods for the fair and efficient adjudication of the controversy."

As the Plaintiffs correctly point out, "[c]ourts routinely hold that a class action is superior where, as here, potential class members are aggrieved by the same policy, the damages suffered are small in relation to the expense and burden of individual litigation, and many potential class members are currently employed by Defendant." Whitehorn v. Wolfgang's Steakhouse, Inc., 275 F.R.D. 193, 200 (S.D.N.Y. 2011); see also Amchem, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."); In re Sinus Buster Products Consumer Litig., No. 12-CV-2429 (ADS)(AKT), 2014 WL 5819921, at *6 (E.D.N.Y. Nov. 10, 2014) (Spatt, J) ("'Class treatment is often deemed superior in negative value cases, in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually.'") (quoting In re Advanced Battery Techs., Inc. Sec. Litig., 298 F.R.D. 171, 182 (S.D.N.Y. 2014)).

As the individual class members' claims are of relatively low value and there exists a common uniform payroll policy, the Plaintiffs assert that they have met the superiority requirement. (<u>See</u> the Pls.' Mem. of Law, Dkt. No. 171, at 24.) The Defendants do not address the superiority requirement in their papers. Again, the Court finds the Plaintiffs have met their burden.

Individual spread of hours cases generally result in a relatively modest recovery, and therefore, courts have often found them to be the kind of "negative value" cases in which class treatment is superior to individual litigation and other available mechanisms, particularly, where, as here, many of the class members are of foreign descent and are unfamiliar with the American legal system. <u>See</u> <u>Morris</u>, 2013 WL 1880919 at *14 (finding that a spread of hours class satisfied the superiority requirement because "the proposed class members are significantly numerous and possess relatively small individual claims. Moreover, there is reason to believe that because many class members are currently employed by Alle and/or of foreign descent, they may fear reprisal and lack familiarity with the American legal system. As a result, not only would a class action in the instant case allow for a 'more cost-efficient and fair litigation of common disputes' than individual actions, but it is likely the only device by which many of the proposed class members would obtain relief."); <u>Iglesias-Mendoza v. La Belle Farm, Inc.</u>, 239 F.R.D. 363, 373 (S.D.N.Y. 2007) ("The proposed class members are almost exclusively low-wage workers with limited resources and virtually no command of the English language or familiarity with the legal system. It is extremely unlikely that they would pursue separate actions.").

The Court finds that the Plaintiffs' individual claims have a relatively modest value, the costs of litigating their claims is likely high, and they, as low wage workers, likely have limited resources. Accordingly, the class action is superior to any other method of pursuing their claims and therefore, superiority is satisfied.

### 7. As to the Appointment of Class Counsel

The Plaintiffs also request that the Court appoint Moser as class counsel pursuant to Rule 23(g), which provides that "a court that certifies a class must appoint class counsel." In appointing counsel, the Rule also requires the court to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g).

Here, Moser has submitted an affidavit describing the extensive work he has conducted in litigating this action, as well as his experiences and resources, both of which the Court has already concluded were sufficient in the context of assessing his adequacy as a class representative. Accordingly, the Court also finds Moser satisfies the standard set forth in Rule 23(g) and appoints him class counsel of the third sub-class.

### 8. Requested Disclosures

Finally, the Plaintiffs request the Court direct the Defendants to provide them with "a computer readable file containing the following information for all class members within 20 days of this Court's order: (i) name; (ii) last known address; (iii) telephone number; (iv) dates of employment with U.S. Nonwovens; (v) regular rate(s) of pay during employment with U.S. Nonwovens." (The Pls.' Mem. of Law, Dkt. No. 171, at 1.)

The Defendants do not oppose this request, and the Court finds it necessary to facilitate notice to the class members.  Accordingly, the Court grants the Plaintiffs' request.

### III. CONCLUSION

For the foregoing reasons, the Court (i) denies the Plaintiffs' motion to certify sub-classes with respect to the third, fourth, and seventh causes of action; (ii) grants the Plaintiffs' motion and certifies a class solely with respect to the fifth cause of action, which the Court defines as "[a]ll non-exempt workers employed by U.S. Nonwovens in the State of New York at any time from November 14, 2006 to the present" who allege that they were not paid a spread of hours premium pursuant to 12 NYCRR § 142-2.4; (iii) appoints the named Plaintiffs as class representatives; (iv) appoints Moser as class counsel pursuant to Fed. R. Civ. P. 23(g); and (v) directs the Defendants to produce to the Plaintiffs a list of all potential class members within twenty days of this Order containing the information described above.

**SO ORDERED.**
Dated: Central Islip, New York
January 15, 2016

*/s / Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge